## ,WOODBRIDGE v. WINSHIP.

PATENTS; INTERFERENCE; BURDEN OF PROOF; APPEAL AND ERROR; REBUTTAL EVIDENCE; REDUCTION TO PRACTICE.

1. The burden of proof is on the junior party to an interference, although he has received a patent through failure of the Patent Office to de-

clare an interference between his application and the pending application of the senior party, to show conception prior to that of the senior party, and either actual reduction to practice or diligence in the prosecution of the invention at the time the senior party entered the field.

2. Where there is unanimity of decision among the tribunals of the Patent Office, adverse to one of the parties to the interference, the burden is on him, on an appeal to this court, to make out a clear case of error in the decision of the Commissioner.

3. Orderly rules of practice must be observed in the Patent Office as elsewhere; and it is not error for the Patent Office to reject evidence offered by the junior party to an interference in rebuttal which he should have introduced in chief, such as evidence showing conception prior to that shown by him in chief; and it is no excuse for not doing so, that he was misled by the other party's evidence, where the preliminary statements show the extent to which he should have gone in proving his case in chief.

4. Where, in an interference relating to a system of electrical distribution, one of the essential features being that the means should be adapted to cause a battery to charge and discharge, and operatively arranged to respond to variations on either a direct or alternating current, and the junior party testified that, in a test made by him in connection with an engineer of an electric company engaged in installing an electric railway system, he reduced the invention to practice, but his testimony was not corroborated by the engineer, who merely stated, that, in the test in question, the battery certainly discharged, and he believed that it charged at times, and he was not then informed by the junior party of his alleged invention; and where it appeared that the junior party made no application for a patent until a year and a half later, and also that he signed a certificate accompanying a sketch of his invention, in which he gave the date of his conception as subsequent to the date of such test, it was *held*, affirming a decision of the Commissioner of Patents, that the test was merely experimental, and while it may have disclosed the conception of the broad idea of the invention, it did not constitute reduction to practice, and that the senior party was entitled to an award of priority. (Citing *Ocumpaugh* v. *Norton*, 25 App. D. C. 90.)

No. 580. Patent Appeals. Submitted May 21, 1909. Decided June 4, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Affirmed.*

The facts are stated in the opinion.

*Mr. Augustus B. Stoughton* for the appellant.

*Mr. William Houston Kenyon, Mr. Richard Eyre,* and *Mr. Gorham Crosby* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an interference proceeding involving priority in respect of an invention relating to a system of electrical distribution, the single count of which reads as follows:

"The combination of alternating and direct circuits having an appropriate converter operatively connected between them, a battery operatively arranged in respect to the direct current circuit, and means adapted to cause the battery to charge and discharge, and operatively arranged to respond to variations of load on either circuit."

In the operation of street railway systems a main generator furnishes the current which feeds the work circuit. On this work circuit there is a frequent change of load. For periods the load may be about the same average. If, however, cars are stopped or blocked, the load necessarily falls. When put in simultaneous motion the load suddenly rises. These sudden changes of load have a deleterious effect on the main generator and engine, and produce other injurious results. To obviate these a large storage battery was ordinarily introduced, connected across the mains adjacent to the main generator. This is so designed and arranged that, when there is a rise of load, the battery will discharge current to the work circuit, and thereby prevent the extra heavy load from falling upon the main generator. Where there is a lighter load in the work circuit the battery charges, thereby taking up some of the force of the main generator. When the load on the work circuit is of the average for which the system is adjusted, the battery "floats," as it is termed; neither charging nor discharging. The storage battery is slow in operation, and to increase the rapidity of its discharge or charge, as the occasion required, there was

introduced a dynamo with armature in series with the battery, which compels the battery to perform its function rapidly. The booster voltage operates in either direction as the demand is for charge or discharge, according to the changes of load in the work circuit.

There is no expert testimony in the record, and we have given such a description of the art as we have been able to gather from the decisions of the tribunals of the Office, and the argument of counsel.

The respective inventors in this controversy, whose devices, though specifically different, conform to the broad terms of the issue, sought to apply this principle of control in a system having an alternating current, and a direct current generator, in combination. They have conceived the idea of duplex control of a battery connected with the direct-current side of the system which will maintain the load on each generator steady, itself receiving or supplying current when the sum of the load of the two circuits is substantially below, or above, respectively, the average for which the combined systems are adjusted. As before said, the system of each inventor is within the broad terms of the issue, and it is, therefore, unnecessary to discuss the specific differences between them.

The issue calls for the following elements: 1. A combination of alternating and direct-current circuits. 2. An appropriate converter, operatively connected between the two circuits. 3. A battery operatively arranged in respect to the direct-current circuit. 4. Means adapted to cause the battery to charge and discharge, and operatively arranged to correspond to variations of load on either circuit. The controversy respecting the° claim by Joseph L. Woodbridge of actual reduction to practice turns chiefly upon this requirement of means to cause the compensatory storage battery to charge and discharge in response to variations of load upon either circuit.

Walter E. Winship is the senior party, having filed his application March 11, 1905. Woodbridge filed on April 19, 1905, and, through failure in the Office to declare an interference, received a patent on May 8, 1906. Woodbridge's statement al-

leges conception of the invention in March, 1903; drawings about the same time; reduction to practice in October, 1903. Winship's statement alleged conception between July 22 and 26, 1904; sketches and disclosure about the same time; further disclosure in August, 1904, and again on December 14, 1904, in making a description, etc., for the purpose of applying for a patent. The early reduction to practice is that effected by filing the application.

Woodbridge had the burden of proof. To overcome Winship's prior application, it was incumbent upon him to show a conception prior to Winship, and either actual reduction to practice, as alleged, or diligence in the prosecution of his invention at the time of Winship's entry in the field. The testimony taken by Woodbridge in chief contained no corroboration of his conception prior to the alleged reduction to practice in October, 1903. In the course of his testimony he offered in evidence a sketch of the specific form of his invention, saying that it was prepared for his patent application. This sketch is a printed blank of the Patent Department of the Electric Storage Battery Company, of which Woodbridge was chief engineer. At the bottom of the drawing and brief description in writing, appears a printed form of certificate with blanks for dates. With the blanks filled up it reads: "This idea was conceived by me December 14, 1904, and the above drawing and description was made by me January 5, 1905, and was shown and described to each of the undersigned witnesses at the date set opposite his name." This bore the signature of Woodbridge and that of an attesting witness, A McMichals, as of date January 5, 1905.

Winship's testimony as to conception on the earlier dates alleged by him was uncorroborated, but there is no doubt of the last date alleged, December 14, 1904, on which he disclosed the invention completely to his patent solicitor, for the purpose of applying for a patent. His earliest date of conception, is, therefore, December 14, 1904, and for reduction to practice he stands on his filed application of March 11, 1905. Woodbridge then took what is entitled rebuttal testimony, attempting to show that

the sketch No. 5, heretofore described, represented an earlier conception of the specific idea. To support this he read certain letters alleged to have passed between him and R. C. Hull, district engineer of the sales department of his company at Cleveland, Ohio; the first of the series being a letter of Hull dated October 27, 1904, to which the reply was under date of November 7, 1904. These letters were produced by Woodbridge. Hull was not examined, and there was no other evidence relating to their writing, despatch, and receipt. The tribunals of the Office rejected this evidence, upon objection, on the ground that it was not rebuttal evidence, and ought to have been introduced in chief.

Each tribunal of the Patent Office held that while the experimentation of Woodbridge at Columbus, Ohio, in October, 1903, may have demonstrated the conception of the broad idea of the invention, it was not an actual reduction to practice. It was said by the Commissioner in conclusion: "Whether, therefore, the Columbus test be held to embody the invention in issue or not, Woodbridge cannot prevail. If it did not embody the invention, Woodbridge was later than Winship in both conception and reduction to practice. If it did, Woodbridge was the first to conceive, but the last to reduce to practice, and was not diligent in reducing the invention to practice at the time Winship entered the field."

This unanimity of decision necessarily imposes the burden upon Woodbridge to make out a clear case of error in the decision appealed from.

The first question to be considered is whether there was error in rejecting, or refusing to consider, the evidence offered by Woodbridge in rebuttal. We think there was not. Orderly rules of procedure must be observed in the Patent Office as elsewhere. The junior party had notice of the dates claimed by his opponent. The proper order of his procedure was to introduce all of the proof upon which he relied to support his own allegations. This additional testimony ought then to have been introduced. It is not in rebuttal of the case made by Winship. Counsel for appellant claims that he was led to be-

lieve, upon the closing of Winship's case, in which he only proved the date of December 14, 1904, that the latter took the position that the issue should be so narrowly construed as to exclude Woodbridge's Columbus disclosure. To meet this contention that it should be construed narrowly, the additional evidence was introduced to show that he was first to conceive under this narrow construction. Further, also, that, as Winship confined his corroborating evidence of conception to December 14, 1904, and hereby abandoned his earlier date, alleged as of July 22, 1904, which antedated the Hull letters, it was proper to show that the idea illustrated by sketch No. 5, as of December 19, 1904, had been earlier conceived, and then communicated to Hull early in November, 1904. As Woodbridge was bound to introduce his evidence first, he had his own statement and that of Winship (which may be called the pleading.) by which to determine the extent to which he should go in proving his case in chief. He could not be misled by evidence which his opponent had not then introduced, or by a position respecting the scope of the invention which he had not then indicated in any manner. Having rested his case in chief, he is limited to rebuttal testimony after the closing of his adversary's proof. Realizing his inadvertency, he might possibly have obtained leave to reopen his case in chief to cure the effect of it. However this might be, he took no such step, and must abide the consequences.

Under our view of the evidence relating to reduction to practice by Woodbridge at Columbus in October, 1903, we may assume that he then had in mind an invention that is within the terms of the issue, and treat him as the first to conceive.

It appears that this test was made October 14 and 15, 1903, in connection with the power plant of a street railway company at Columbus, Ohio, by J. L. Woodbridge, the inventor, and J. E. Woodbridge, an engineer of the General Electric Company, at Schenectady, New York, who had installed the entire plant of the railway company. Both witnesses testified as to what occurred, after a lapse of five years. J. E. Woodbridge made a written report of the operations at Columbus to his

own company, under date of October 22, 1903, which was read in evidence. This states tests 1, 2, 3, 4, and 5 as made. Test No. 1 is the only one of these which Woodbridge claims could have embraced the invention which it is claimed was then reduced to practice. This report was submitted to J. L. Woodbridge, who made no comments upon it, but gave it his general approval. J. E. Woodbridge was not informed of any special purpose that J. L. Woodbridge had in view. J. L. Woodbridge was asked, in cross-examination, to point out any language in the report which suggested that they were trying to see how much they could cause the battery to act to assist the fluctuations originating outside Substation E (where the tests were made). To this he answered as follows:

"I do not know that there is any language in this report which attempts to indicate what I was trying to demonstrate. Mr. J. E. Woodbridge joined me in these tests with an avowed purpose quite different from mine. He was looking for combinations which could insure the greatest stability of operation with respect to the direct-current output of the rotary, and was therefore looking to produce results exactly the opposite of those which I intended to produce. This is obvious from the language under the heading 'General Conclusions.' In this paragraph he states that, for small plants, the differential booster is to be preferred. The differential booster is designed to prevent, as far as possible, the battery from charging and discharging in response to any changes on the alternating-current circuit, but is designed to maintain a constant direct-current output from the rotary converters. Mr. J. E. Woodbridge was endeavoring to ascertain what combination of apparatus would most nearly secure this result. His report to his own company, therefore, includes his observations and conclusions on that point."

It does not appear from J. E. Woodbridge's testimony that the tests were made with a view to ascertain anything else than he himself had in view. In his report he states that test 5 was preferable to test 1, and recommended 2 and 5 in preference to others. The Examiners in Chief say that further un-

certainty in this test, in so far as the present invention is involved, is found in the conditions prevailing in the system at the time. It appears, they say, that the railway was supplied by an alternating-current generator, situated 60 miles away, which gave a high tension current that was stepped down at a number of intermediate substations by stationary transformers and fed to rotary conductors. At the Columbus station there were two shunt rotary converters supplemented by engine-driven direct-current generators, also in parallel with the rotary converters across the direct-current bus bars. The direct-current generators, however, were disconnected during the conduct of experiment No. 1. They further say: "A battery and booster in series were also connected across the direct-current bus bars, the field of the latter being compound wound, one coil in series with the battery and the other in shunt, and capable of manual control. As we understand it, this arrangement of battery and booster is a common one when a battery is employed to correct the irregularities of the load of a direct-current system. It is also well known, and appears from the testimony of Woodbridge, that the function of the booster so connected is to magnify the charge and discharge of the battery caused by fluctuations in the voltage across its terminals. The booster does not initiate or determine the charge or discharge. That would take place as surely and at the same time if no booster were present, but would merely be less in amount." In this connection, they quote from an article of J. L. Woodbridge, published in Cassier's Magazine for November, 1905, in which he says: "The simplest type is that with the booster field coil in the battery circuit. This is commonly called the 'straight-compound' booster. * * * In this type of installation, the booster alone cannot cause the battery to charge and discharge, since it depends upon the current in the battery circuit to actuate it. It is necessary, therefore, to provide some outside cause to produce battery discharge or charge, and the booster will then become a factor in determining the amount of such charge or discharge. As already mentioned, the only

way to cause a battery to discharge is to lower its terminal voltage."

We shall not pursue the suggestions made as to the state of the alternating-current generator, 60 miles away, and the unnoted fluctuations of that current through causes operating there and on the line elsewhere, for we must confess our inability to appreciate what effect these may have had. It is, as before remarked, an essential feature of the issue that the means shall be adapted to *cause* the battery to charge and discharge, and operatively arranged to respond to variations on either circuit; that is, the alternating and the direct circuit. This is distinguishable from means adapted merely to augment or magnify the charge and discharge of the battery. There must be a regulating apparatus that shall be acted upon by a change in the load of either of the circuits, whether there is a change in the other or not.

Now, while J. L. Woodbridge testifies that, in the Columbus test, the battery charged and discharged in response to variations of load of either the direct-current or the alternating-current circuit, he is not corroborated in this by J. E. Woodbridge. The latter says the battery certainly discharged during the tests, and he believes that it charged at times. In this connection it was said by the Examiners in Chief: "We have no certain testimony on the part of J. E. Woodbridge that the battery charged at all. While he testified that its output varied according to the fluctuations of load on the substation and fluctuations of pressure on the transmission line, he does not state to what extent it varied, or in what direction, with reference to the fluctuations in load and pressure; nor does he give any facts by which we can come to a conclusion as to the value of the arrangement. Such testimony is wholly inadequate to overcome the strong circumstantial evidence to which we have referred, that what was done at Columbus was, at most, an abandoned experiment." Among the circumstances referred to is that the test was but one of a series of five, lasting, in all, but a day and a fraction of a day. The failure of J. L. Woodbridge to inform J. E. Woodbridge of his invention and of his purpose

to test it then and there specially, and the failure of the latter to observe and report it, have been adverted to. Again, no application for patent was made until a year and a half later, and no system embodying the invention was introduced by a company necessarily alive to its value, until in 1906. And, when application was finally made, it disclosed an elaborate and complicated arrangement, quite different from that which he claimed to have tested and reduced to practice at Columbus, a year and a half before. These circumstances tend strongly to justify the inference that, if the invention was then fully in the mind of the inventor, the test was experimental, and of an unsatisfactory character. *Ocumpaugh* v. *Norton,* 25 App. D. C. 90, 94.

An additional, and what seems to us a strong circumstance, warranting the inference not only that the Columbus test was neither complete nor convincing, but also that there was not then a complete conception of the invention, is found in the testimony relating to the drawing dated January 5, 1905. It was drawn by Woodbridge himself upon a blank of the patent department of his company. Managers of such departments have long since learned to appreciate the great importance of preserving record dates of descriptions and illustrative drawings of inventions. The blank shows that it was devised with this end in view. Presumably the importance of proving dates was known to the appellant; at any rate, it was called to his attention when he recorded the fact on January 5, 1905, that "this idea was conceived by me December 14, 1904," and called a witness to attest it.

Notwithstanding this presents a more elaborate and complex form of the system than that of the Columbus test, yet, as he contends, the inventive conception, the "idea," is expressed in both. If this idea had been fully conceived and its utility practically and satisfactorily demonstrated more than a year before, it is difficult to conceive why the inventor failed to state this earlier conception of the idea which he was carrying out in improved form only.

Upon the whole, we have not been convinced that there was

error in the decision of the Patent Office tribunals. For that reason the final decision must be affirmed. It is so ordered, and that the clerk certify this decision to the Commissioner of Patents, as the statute requires.                    *Affirmed.*